**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **V.O-C. and N.C., individually and on behalf L.O-C., a child with a disability,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**Saucon Valley School District,**<br><br>**Defendant.** | **CIVIL ACTION**<br>**No. 2:26-cv-6175** |

## COMPLAINT

L. O-C. (L.J.) has never received a free appropriate public education (FAPE) from Saucon Valley School District (District). And his parents did not get a fair opportunity to challenge the District's inadequate educational program. His parents respectfully ask this Court to rule that the District denied L.J. a FAPE.

## PARTIES

1. L.J. is a 9-year-old boy who lives with his parents, V.O-C (Mother) and N.C. (Father) (Plaintiffs or Parents) within the Saucon Valley School District. Mother is an attorney and Father is a pilot for an international airline.

2. L.J. is a "child with a disability" within the meaning of the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1401(3)(A), 34 C.F.R. § 300.8, and a "qualified individual with a disability" within the meaning of § 504 of the Rehabilitation Act of 1973 (Section 504 or RA), 29 U.S.C. § 705(20).

3. Saucon Valley School District (Defendant or District) is a "Local Educational Agency" (LEA) within the meaning of 20 U.S.C. § 1401(15), 34 C.F.R. § 300.28, 22 Pa. Code

14.102(a)(2)(vii) and also a “recipient” of federal funds within the meaning of Section 504, 29 U.S.C. § 794(b)(2)(B).

## JURISDICTION AND VENUE

4. This court has federal question jurisdiction under 28 U.S.C. § 1331, under the IDEA, 20 U.S.C. §1415(i)(2) and under the RA, 29 U.S.C. § 794(a).

5. This court is the proper venue under 28 U.S.C. § 1391, as the parties reside within and the causes of action arose within this judicial district.

6. The claims in this this Complaint have been exhausted at the administrative level through a final administrative decision dated May 26, 2026 by Independent Hearing Officer (IHO) James Gerl of the Pennsylvania Office for Dispute Resolution.[1]

7. Parents have exhausted their administrative remedies and are “aggrieved” by the IHO’s decision.

## RELEVANT BACKGROUND TO THIS APPEAL

8. L.J. has SCN2A, a rare genetic mutation that manifests as autism, global developmental delay, PICA GERD, intellectual disability, feeding difficulty, hypotonia, and sensory processing disorder.

9. He cannot use words or symbols or communicate his most basic needs with language. His severe communication delays make it very difficult to assess his academic and social-emotional capacities and to design and implement a curriculum for him.

10. L.J.’s cognitive and fine motor skills are comparable to a 13 to 14 month old toddler and his expressive and receptive language skills are comparable to a typically developing child of

[1] IHO Gerl’s May 26, 2026 decision is attached as Exhibit A.

8 to 9 months. While L.J. can walk, he has poor balance and muscle tone. He needs specialized seating to sit upright for any length of time.

11. He has no independent living skills, including eating, toileting, bathing or dressing.

12. He does not interact with, respond to or imitate the behavior of others, including that of a teacher or aide seated directly in front of him. He does respond to sound and music, however, and can repeat melodies he hears.

13. In summary, he is a severely developmentally delayed boy who needs intensive, expert educational interventions.

14. The IDEA requires that schools provide students a free appropriate public education (FAPE). In *Endrew F. v. Douglas County School Dist. RE–1*, the Supreme Court explained how schools use Individualized Educational Programs (IEPs) to provide FAPE:

> The IEP is the centerpiece of the statute's education delivery system for disabled children. A comprehensive plan prepared by a child's IEP Team (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures. These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. The IEP is the means by which special education and related services are tailored to the unique needs of a particular child.[2]

15. The *Endrew F.* court held that, to meet the IDEA's substantive threshold for FAPE, an IEP must be calculated for a child to make progress that is appropriate in light of his or her individual circumstances.[3]

16. Among many other provisions, the IDEA requires an IEP to include "[a] statement of the special education and related services and supplementary aids and services, based on peer-

---

[2] 580 U.S. 386 (2017) (quoting *Honig v. Doe*, 484 U. S. 305, 311 (1988); *Bd. of Educ. v. Rowley*, 458 U. S., at 181; 20 U.S.C. § §1414(d)(1)(B)) (internal quotes and citations omitted).

[3] *Endrew F.*, 580 U.S. 386.

reviewed research to the extent practicable."[4] The "peer-reviewed research" requirement is crucial here because this appeal involves, among other issues: (1) Parents' allegation that the District failed to offer L.J. instruction based on peer-reviewed research; and (2) the IHO's refusal even to consider Parent's extensive evidence proving the District's failure.

17. Relevant to L.J. in particular, there is consensus in peer-reviewed research, and among courts, that children with autism should be taught using the scientific approach known as Applied Behavior Analysis (ABA). Whether labeled a methodology, curriculum, technique, philosophy, approach, or something else, ABA is a science that must be implemented properly and rigorously to be effective.

18. The District has never offered L.J. proper ABA instruction. The result has been minimal to no educational progress.

19. In Fall 2022, Intermediate Unit 20 (I.U. 20)[5] engaged Doreen Quinn, a Board Certified Behavior Analyst (BCBA), to evaluate L.J. Observing him four times between September 1, 2022 and October 13, 2022, Quinn noted, among other things, that L.J.:

- Needed hand-over-hand (HOH) prompting to clap, but still clapped with closed hands.
- Failed to imitate classmates' movements while they were responding to the teacher.
- Needed HOH prompting to use a 4-button communication device.
- Needed HOH prompting and significant physical prompting to participate in a game where children stood, sat, and rolled dice with each other.
- Was unable to follow directions to hold a plastic egg or eat with a spoon.
- Repeatedly reached out to touch his peers.
- Did not respond when peers offered to high-five him.
- Could only attend to lessons for 9% of observed intervals.[6]

---

[4] 34 C.F.R. §300.320(a)(4).

[5] Pennsylvania has 29 IUs, which are regional educational agencies that support school districts and children with special needs. The Pennsylvania Association of Intermediate Units explains: "[IUs] serve students and schools by providing essential educational services, such as special education, online learning programs and support, preschool programs, professional development for educators, administrative and purchasing consortia and much more." Https://paiu.org/ (visited Aug. 20, 2026).

[6] FBA, Oct. 14, 2022, Sch. Dist. Ex. (S-2), at 1-3. Note: Two BCBAs named Quinn are involved in this matter.

20. She wrote that although he engaged in self-stimulatory (*i.e.*, stimming) behavior like rocking, or chewing on a sensory stick, these behaviors were not of concern; rather, they could be how L.J. communicated and would not necessarily interfere with his learning.

21. She then recommended that L.J. be taught using ABA:

> [I]t is strongly recommended to develop programming for specific skills using applied behavior analytic procedures. Specific skills may include those skills that are pivotal skills in further accessing learning opportunities and social interactions such as a generalized imitative repertoire, joint attention, functional communication, accurate and purposeful indication of receptive identification and choices, following one step directions, wearing his glasses, etc. [7]

22. She added:

> ABA procedures include everything from a contrived setting of hundreds of opportunities for practice using extrinsic reinforcement to using a precise prompting hierarchy and the natural reinforcement that comes with everyday student activities in the natural environment.[8]

23. The District failed to provide anything approaching real ABA instruction. It does not even claim to have done so, saying instead that it incorporated general principles of ABA into L.J.'s lessons. However, even this claim is overstated. In a key passage of testimony the District has cited as evidence that it incorporated ABA principles, its witness, I.U. 20 Director of Special Education Kasey Kinney, discussed the general classroom setup and techniques applicable to all students, including 1:1 instruction, prompting, positive behavior support plans, high-fives, praise, classroom work-stations. Tr. at 588:6-589:16. But she notably did not discuss the intensive, individualized, data-driven, cumulative, iterative, professionally (BCBA) designed and supervised instruction that peer-reviewed research considers to be ABA instruction.

24. In fact, L.J.'s teachers were not trained or qualified to provide real ABA instruction

---

[7] *Id*. at 4.
[8] *Id*.

and did not receive adequate BCBA supervision to ensure that they were doing so.

25. Unfortunately, the IHO rebuffed all of Parents' efforts to prove the obvious flaws in the District's program for L.J., including the problems with its purported use of ABA.

26. L.J.'s IEPs from the District were inappropriate in other respects beyond deficiencies in ABA instruction. They set goals for him to acquire complex skills before he had acquired simpler, predicate skills that would allow him to work towards more complex ones. For example, the 2024 IEP includes the following goal:

> When given an activity that involves taking turns (rolling ball back and forth, hitting a drum, pushing a car), LJ will take turns with another person for 8 out of 10 opportunities over three consecutive weekly probes.

27. While a taking turns goal may seem straightforward and important, it was too advanced for L.J. At that time (and still) he lacked "joint attention" – the fundamental ability to share focus on an object/event with another person. Many children with autism need to be taught joint attention and other predicate skills – skills most people do not even notice or consider to be skills at all – explicitly and properly.

28. L.J.'s IEPs were not written to teach him such predicate skills. Thus, without the skill of joint attention, L.J. could not understand what a turn was, let alone how to take turns. This is just one illustration of how L.J.'s IEPs have been inappropriate.

29. When L.J. predictably failed to meet his complex goals each year, the IEP team, rather than revisit them and break them into predicate skills – which is one of the key strengths of real ABA instruction – abandoned them for new, similarly complex and unattainable goals.

30. Beyond the content of its IEPs, the District provided L.J. too little individualized instruction generally. Rather than give him the 20-30 hours of individual ABA instruction, which he needed to have a reasonable opportunity to make appropriate progress, it gave him only 35

minutes per day of the ABA-adjacent activities about which Ms. Kinney testified.

31. Meanwhile, in outside settings, L.J. did make good progress using ABA, which showed that it was effective when trained individuals used it properly with him.

32. For two years, observing L.J.'s stagnation in school, Parents patiently worked with the District to improve L.J's programming. When they were unable to convince the District to provide L.J with more intensive, appropriate, true ABA programming, they were left with no choice but to file a lawsuit under the IDEA to vindicate L.J.'s and their own rights.

## ERRORS BY THE INDEPENDENT HEARING OFFICER

33. Parents filed their Due Process petition on December 19, 2025. The Pennsylvania Office for Dispute Resolution (ODR) appointed James Gerl, Esq. as the IHO.

34. IHO Gerl presided over a two-day Due Process hearing. He imposed strict time limits on witness testimony and expressed impatience with Parents and their counsel. On May 26, 2026, he issued a decision finding that the District had offered L.J. a FAPE for all school years in question and denying Parents relief.

35. The IHO committed significant errors both in how he reached his decision and how he conducted the Due Process hearing. He rushed through the Due Process hearing, denied Parents a fair opportunity to make their case, and capriciously disregarded Parents' experts and evidence.

36. The IHO's decision is flawed and should be vacated.

### I. The IHO offered a superficial, incorrect analysis of the merits of this case. His decision does not deserve institutional deference from this Court.

37. The IHO offered a superficial and incorrect analysis of the merits of this case. While

reviewing courts are tasked with conducting a "modified *de novo*" review of IHO decisions,[9] which includes giving some institutional deference (due weight) to the IHO, the IHO here did not demonstrate the subject-area expertise or quality of reasoning that merit this Court's deference.

38. For example, he found that L.J. made progress between May 2023 and May 2024 but cited no data to support that finding. IHO Op. at 8. Instead, he simply referenced three exhibits (a progress report and two IEPs) and three pages of general testimony without explaining how they supported this crucial finding. *Id*. He ignored that much of the progress report he cited consisted of blurbs cut and pasted from one academic quarter to the next.[10] Moreover, he never held that L.J.'s progress was "appropriate in light of his circumstances," as *Endrew F.* requires.

39. The IHO found that the District used "various applied behavior analysis techniques" and "Evidence Based Practice" (EBP). IHO Op. at 11-12. However, rather than explain why the supposed EBP was appropriate and consistent with ABA, he listed almost every known technique within ABA – a list pasted from one page in the District's IEP (S-22 at 59). He overlooked that these techniques all require extensive training and supervision absent here, data collection also absent here, and that they are not internally compatible. He included almost no detail about any of these techniques. And he ignored that the District did not offer testimony to explain how it used these techniques, let alone how it individualized them for L.J.

40. Surprisingly, despite finding that the District had used numerous ABA techniques, he rejected Parents' contention that the District had not offered ABA with sufficient intensity or fidelity, making a straw argument that Parents had no right to "dictate" the intensity or

---

[9] *See, e.g., C.F. v. Council Rock Sch. Dist*., No. 24-402, 2026 U.S. Dist. LEXIS 139097, at *8 (E.D. Pa. June 22, 2026) ("When reviewing a hearing officer's decision in an IDEA case, district courts apply a modified *de novo* standard of review. This means that the Court must afford 'due weight' to the findings in the administrative proceeding (also known as a 'due process hearing' in IDEA parlance. 'Due weight' means that factual findings from the administrative proceedings are to be considered *prima facie* correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." (Internal citations and quotes omitted).

[10] Ex. S-12.

methodology of instruction. IHO Op. at 19. Parents were not dictating a methodology, just insisting that whatever methodology the District used was adequate to meet L.J.'s needs.

41. The IHO similarly held that Parents failed to prove that L.J. needed ABA in a greater dosage. *Id*. at 20. But he ignored Parents' expert, Dr. Roberta Krauss, who opined that L.J. was "among the most severe" cases of autism she had seen, Tr. at 267:14-20, and, referring to seven research studies that Parents entered into evidence, opined that L.J. should receive at least 4 hours per day of ABA intervention, in 30-minute increments. The articles, she explained, "support the need [for] more intensity in ABA intervention, combined with the importance for timing or when intervention is delivered, meaning early in a child's life." Tr. at 269:12-16. She added that she knew of no research suggesting that offering ABA for less than 20 hours per week could be effective for a child with L.J.'s severe autism. Tr. at 268:14-19.

42. Rather than grapple with Krauss's testimony – which the District did not rebut – the IHO dismissed it as a non-individualized, "sweeping generalization" about the minimal hours of ABA required for a severely-impaired student like L.J. IHO Op. at 21. Oddly, given Krauss's testimony, he dismissed Parents' research studies on the incorrect ground that "there was no testimony at the hearing concerning the reliability or validity of the articles or their meaning." *Id.* at 19. He either forgot or ignored that Krauss had endorsed the articles. Tr. 267:21-269:16 (endorsing Exhibits P-20-26); Moreover, the District had an opportunity to cross-examine Krauss about all of the studies, but asked her only about one of them. Tr. at 286:2-288:13 (discussing Ex. P-20). On redirect, Dr. Krauss addressed the District's implicit concern that one such study involved children slightly younger than L.J. She opined that its results still applied to him. Tr. 291:13-293:8. The District did not rebut her testimony.

43. Perhaps most surprisingly, the IHO summarily rejected these studies as too general:

"[T]hese articles relate to children with autism in general and not to the unique individual needs of the student, who is the subject of this case." IHO Op. at 19. This critique was misplaced. Peer-reviewed research studies are cited precisely to apply general results to a specific case. Here, the studies collectively revealed a scientific consensus that educating children *like L.J.* using various intensive dosages of ABA was effective. Unfortunately, there are no available, peer-reviewed research studies of the efficacy of ABA for children whose autism is traceable to SCN2A, L.J.'s very rare genetic mutation. But Dr. Krauss used her expertise to apply the findings of these studies to L.J. – a proper, ordinary role for experts.

44. Perhaps most confusingly, the IHO seems to have implied that, by citing general studies of children with autism receiving ABA, Dr. Krauss and Parents had engaged in pernicious stereotyping and labeling of L.J (or other children with autism) by citing these general studies. *Id.* at 19 (collecting cases). But the cases he cited stand for the uncontroversial proposition that IEP teams and courts should focus on whether the substance of an IEP meets a child's needs, regardless of the child's disability classification. *See Fort Osage R-1 Sch. Dist. v. Sims ex rel. B.S.*, 641 F.3d 996, 1001 (8th Cir. 2011) ("The diagnostic label attached to a disabled student is not particularly important because the transcending consideration is whether a district developed an IEP that addressed the manifestations of a student's conditions and addressed his/her needs.") (Internal quotes omitted). The IHO did not explain how Parents' research studies – which collectively reflected the overwhelming scientific consensus that children with autism benefit meaningfully from rigorous ABA instruction – exalted labels over substance. The Court owes no deference to the IHO's rejection of the Parents' research studies or to his unspoken decision to ignore Dr. Krauss's testimony endorsing them.

45. The IHO also erroneously and summarily dismissed Parents' behavioral expert,

Eileen Quinn – a Board Certified Behavior Analyst with 40 years of experience – without discussing let alone grappling with the substance of her testimony. IHO Op. at 21. He criticized Quinn for not preparing a report; however, his individual practices gave parents a choice: an expert could prepare a report but then could only testify on direct for 10 minutes, or they could testify for an hour if they had not prepared a report. Parents chose to have Ms. Quinn do the latter.

46. The IHO improperly ignored significant testimony from Quinn. She opined that L.J.'s had either made no progress or regressed on all but one of his IEP goals. Tr. at 320:4-321:11; 326:2-15. She also explained that the District failed to administer the important "barriers assessment" component of the Verbal Behavior Milestones Assessment and Placement Program (VB-MAPP), the widely-accepted ABA assessment tool that the District purported to use with L.J. Tr. at 327:8-328:16. She explained that the barriers assessment would have identified the specific skills L.J. lacked, and how those gaps prevented him from becoming an effective learner. *Id*. She then testified at length about how L.J displayed numerous such barriers, that the District should have identified them, and that there were evidence-based ways to teach skills to overcome these barriers, which the District failed to employ. Tr. at 330:23-349:13. The IHO ignored all of this testimony.

47. The IHO's assertion that Quinn "gave no testimony to explain why this particular student might require a school program with 20 hours per week of ABA-based therapy" is simply wrong. IHO Op. at 21. Quinn testified that L.J. needed three to five hours per day of rigorous, data-driven ABA instruction to see a difference in his progress. Tr. at 349:14-352:15. The Court need not defer to the IHO's mischaracterization of Quinn's testimony.

48. The IHO also summarily dismissed the report and testimony of Parents' speech language pathologist, Kristin Ellis, because the specific AAC device she recommended weighed a

few pounds more than she said would be advisable. IHO Op. at 21. But he did not explain why that small discrepancy discredited her entire report and all of her testimony.

49. Perhaps most confoundingly, the IHO summarily rejected all of L.J.'s mother's testimony. IHO Op. at 25. His reasoning was that she was "was unable to state what the student had learned through the parents' home-based ABA program" and that she "conceded that the parents had never shared the records of the home-based program with the school district." *Id*. These reasons are perplexing. *First*, the IHO did not specify where in her testimony she failed to state what L.J. learned in home-based ABA – what did he believe she should have known? *Second*, the IDEA does not require a parent to have any specific subject matter knowledge at all; therefore, L.J.'s mother's ability to articulate the precise results of a home-based ABA program had no bearing on this case. *Third*, the IHO accused her of failing to share a document with the District. However, he omitted the important detail that the document, Exhibit P-1, was created on January 6, 2026, just two weeks before the first day of the hearing. And Parents did disclose it in their required pre-hearing disclosures. In sum, the IHO gave no reason at all to doubt L.J.'s mother's overall veracity or the accuracy of her accounts and observations of L.J. as a witness. The Court should not defer to his misplaced credibility assignment.

## II. The IHO's capriciousness during the hearing and his mischaracterizations of the parties' demeanors undermine the quality and reliability of his decision.

50. The IHO's capriciousness during the hearing and his mischaracterizations of the parties' demeanors undermine the quality and reliability of his decision. An IHO presiding in the first instance over an IDEA matter has a solemn responsibility to treat all parties with respect and ensure that they have a full opportunity to make their case. Here, the IHO showed far more concern with conducting the hearing swiftly than with giving Parents the chance to prove their case.

51. *First*, he included extraneous and inaccurate statements about Parents and their

conduct during the hearing. He incorrectly stated and then wrote that the parties had a "toxic relationship," citing only one teacher's equivocal testimony. As Parents' counsel indicated on the record, there was no such toxic relationship. Tr. at 425:3-10. The IHO nevertheless maintained his opinion without any basis, not even acknowledging that Parents contested his characterization.

52. *Second*, the IHO made a jarring accusation that Parent's counsel and Mother were not taking their case seriously because they arrived late to the first hearing date. He ignored that the circumstance was beyond Parents' control. L.J.'s father had planned to stay home with the family's two special needs children during the hearing while L.J.'s mother attended. L.J.'s father is an international airline pilot. He was scheduled to fly home from Europe the day before the hearing, but his flight was canceled due to maintenance issues. He was assigned to a flight the next morning, which arrived on the morning of the hearing. That morning, the District opened its schools two hours late due to weather, and, with L.J.'s father still flying home, L.J.'s mother could not secure childcare on the morning of the hearing. Parent's counsel notified opposing counsel of this delay and left a message with the IHO as well. Parent's counsel chose to wait for his client to arrive at the hearing. The hearing started approximately an hour late.

53. Rather than show sympathy to Parents for this unfortunate and unavoidable series of events, the IHO angrily accused Parents and their counsel of not taking the proceedings seriously. Tr. at 425:25-426:3. The IHO plainly forgot or failed to appreciate that Due Process hearings are exceedingly rare, major life events for parents. His words were a grave insult to parents facing the overwhelming triple-stress of having children with severe special needs, feeling helpless in the face of their child's lack of progress, and actually having to appear at a trial to vindicate their and their child's civil rights.

54. Throughout the hearing and in his decision, the IHO made blanket, unsupported

statements discounting the credibility of Parents and their witnesses, while giving the District and its witness an overwhelming benefit of the doubt on virtually all issues.

55. The IHO improperly held that Parents' assertion of L.J.'s IDEA "Stay Put" rights[11] in the Fall of 2024 "purposely delayed" implementation of the District's offered program, and that they essentially forfeited their right to challenge the adequacy of the Stay Put placement during that period. IHO Op. at 25. This legally indefensible holding undermined both Parents' Stay Put right and their right to allege a denial of FAPE. A parent can invoke Stay Put as the "lesser of two evils," that is, she can invoke her right to maintain a current placement – however inappropriate it might be – rather than allow the school to move her child to an even less appropriate one. *See, e.g., Me. Sch. Admin. Dist. No. 35 v. R.*, 321 F.3d 9, 19 (1st Cir. 2003).

56. The IHO also erroneously opined that Parents must meet a "higher legal standard" when they seek a judicial order for a "prospective private placement." IHO Op. at 26. The IHO appears to have been opining that a parent who can afford to pay for private school and then sue for tuition reimbursement has a lower burden to prove a denial of FAPE than a parent who cannot afford private school and asks the IHO to order the school district to place her child "prospectively" in an appropriate private placement. The IHO cites no statutory language or case law to support this groundless position. In any event, the IDEA gives this Court authority to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).

57. The IHO also deemed waived several issues that Parents properly raised before and during the hearing. IHO Op. at 5, 24. This was another reversible error.

---

[11] The IDEA provides that parents may insist that their child remain in his or her placement during IDEA litigation. 20 U.S.C. § 1415(j) ("[D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.").

58. In sum, the IHO's decision is not well reasoned and does not merit this Court's deference.

**COUNT I**

**Individuals with Disabilities Education Act and**
**Pa. Code Chapter 14**

59. Plaintiffs re-allege paragraphs 1 through 58.

60. The IDEA requires Local Education Agencies to provide children with disabilities a Free Appropriate Public Education. 20 U.S.C. § 1412(a)(1)(A).

61. They must offer IEPs reasonably calculated for a child to make progress appropriate in light of his or her circumstances.

62. Here, the District failed to offer Parents and L.J. IEPs calculated for L.J. to make progress appropriate in light of his circumstances.

63. The District has denied Parent and L.J. a free appropriate public education under the IDEA. 20 U.S.C. § 1412(a)(1)(A).

**COUNT II**

**Discrimination in Violation of Section 504**
**of the Rehabilitation Act of 1973 and Pa. Code Chapter 15**

64. Plaintiffs re-allege paragraphs 1 through 63.

65. The District has intentionally and/or with deliberate indifference violated the rights of Parents and L.J., as secured by Section 504 and 22 Pa. Code Chapter 15 by:

(i) Subjecting L.J. to discrimination on the basis of his disability, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(a).

(ii) Denying L.J., on the basis of his disabilities and the severity of his disabilities, the opportunity to participate in and benefit from federally assisted education services, programs, and activities, including academic and nonacademic services and school

activities, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(a), (b)(I).

(iii) Denying L.J. an opportunity to participate in and benefit from education in the School and other services that is equal to the opportunity afforded students without disabilities, in violation of 34 C.F.R. § 104.4(b)(ii).

(iv) Limiting L.J.'s enjoyment of the right and opportunity to receive a public education, in violation of 34 C.F.R. § 104.4(b)(1)(vii).

## RELIEF REQUESTED

WHEREFORE, for the reasons stated above Parents respectfully requests this Court assume jurisdiction of this action and award the following relief:

a. Assume jurisdiction over Plaintiffs claims under federal and state law.

b. Receive and review the administrative record.

c. Receive additional evidence proffered by Parents.

d. Reverse the Independent Hearing Officer's May 26, 2026 order.

e. Find that the District failed to provide a FAPE to L.J. for the 2023-2024, 2024-2025 and the 2025-2026 school years, in violation of the IDEA and Chapter 14.

f. Find that the District discriminated against L.J. on the basis of his disability for the 2023-2024, 2024-2025 and the 2025-2026 school years, in violation of the RA and Chapter 15.

g. Order the District to create and implement an IEP that offers ABA with fidelity or fund an appropriate outside school placement.

h. Order the District to reimburse Parents for the costs of all L.J.'s independent evaluators' professional services, expert costs, including providing testimony in this Court.

i. Order the District to provide compensatory education funds consistent with the period in which L.J. was denied a FAPE and/or adequate to remedy the deprivation of his rights.

j. Enter judgment in favor of Plaintiffs and against Defendants, and

k. Award attorney's fees, costs and expenses, as well as such other relief as may be just and appropriate.

**Dated: August 21, 2026**

Respectfully submitted,

__________________________
Benjamin J. Hinerfeld, Esq.
David Lapp, Esq.
Law Office of Benjamin J. Hinerfeld
1528 Walnut Street, Suite 1100
Philadelphia, PA 19102
(Tel) 215.694.7432
(Fax) 215.689.2423
Ben@Hinerfeldlaw.com

***Counsel for Plaintiffs***